JIMMY A. PICKETT *et al.*, Plaintiffs-Appellants, *v.* FIRST AMERICAN SAVINGS & LOAN ASSOCIATION, Defendant-Appellee.

Fifth District    No. 79-415

Opinion filed November 12, 1980.—Rehearing denied December 10, 1980.

246

HARRISON, J., dissenting.

James W. Sanders & Associates, of Marion, for appellants.

Caldwell, Troutt & Alexander, of Benton, for appellee.

Mme JUSTICE SPOMER delivered the opinion of the court:

The plaintiffs, Jimmy and Marilyn Pickett, arranged with defendant, the First American Savings and Loan Association, to procure a contract of credit life and disability insurance in conjunction with a home loan extended to them on October 12, 1973. After discovering in March of 1975, following a disabling injury, that the defendant had no record of such insurance covering Mr. Pickett, the plaintiff filed a complaint in Franklin County Circuit Court charging the defendant with negligence and requesting the equitable remedy of an accounting for the amounts to which they would have been entitled had the policy been procured. The

Picketts appeal from a judgment entered April 30, 1979, following a bench trial, in favor of the defendant. The court found the savings and loan association liable only for amounts collected as intended premium payments for the insurance on the basis of a contract implied in fact.

██ The issues presented by the plaintiffs are whether a savings and loan association, acting in behalf of a borrower, which collects and holds payments intended to be applied as credit insurance premiums after indicating that such insurance is to be obtained, may be held accountable for insurance benefits where it failed to procure such a policy and failed to promptly notify the intended insured that no such policy had been procured; and secondarily, whether, under such circumstances, it is necessary for a litigant to establish the terms of a particular policy in order to maintain a claim for failure to procure insurance. We reverse the trial court.

On the afternoon of October 8, 1973, the plaintiffs met with Larry Nolen, executive vice president of First American Savings and Loan (hereinafter First American), at the association's office in Benton, Illinois, in order to arrange a loan for the purchase of property located in West Frankfort, Illinois. All of the pertinent negotiations were made through Nolen, and the loan of $15,398.38 was closed on October 12. In discussing the various terms of the loan, Marilyn Pickett inquired about the advisability of obtaining credit life and disability insurance. Nolen checked the cost of such insurance in a rate book and informed them of the amount. The plaintiffs asserted that they desired to carry this form of insurance, and Nolen provided them with an application form which they completed and signed.

In negotiating the loan, the parties used a printed work sheet supplied by First American entitled "Loan Settlement Statement," which was in all respects identical in form with that used as a memorandum regarding the terms of the loan when officially closed on October 12. In the bottom left quarter of the work sheet, under the title "Monthly Loan Payment" is found an itemized list of the five components which comprised each monthly payment. They include a charge for (1) principal and interest, $108; (2) real estate taxes, $16; (3) hazard insurance, $8; (4) mortgage insurance, $3; and (5) credit life and disability insurance, $5.70. Category number 5 on the form was a reserved blank space immediately above the word "total," which was presumably used for any specifically tailored payment provision which a borrower or the lender might require. In that space the words "credit life and disability" were printed in longhand capital letters by Nolen. On the typed form signed by the couple on October 12, the words just mentioned are missing from the space used for category 5, perhaps simply for lack of typewriting space; but in the column immediately adjacent the identical figure of $5.70 is

typed in below the other figures. Total payments due each month commencing on the 15th of October 1973, were to be $140.70.

Following the customary practice of First American, after the closing the Picketts were sent an account book by mail in which their loan payment record was to be written. It, too, contained an itemization of each installment to be paid, and this itemization contained a provision of $5.70 for credit life, accident and health insurance. Over the ensuing 19 months the plaintiffs paid $140.70 each month, assuming that this amount included payment of premiums for the insurance coverage.

On March 5, 1975, Mr. Pickett injured his back while at work. Later that month Mrs. Pickett called First American to activate the credit insurance benefits and was informed that after reviewing their file, the association had determined that the plaintiffs had never obtained such a policy. Shortly thereafter, Mr. Pickett called concerning the matter, and it was also explained to him that he was not covered. There was some confusion in the testimony concerning correspondence between the parties during April; however, it appears that First American sent the Picketts credit insurance application forms, related to specific insurers, in an attempt to aid them in obtaining a credit insurance policy. On May 5, the defendant mailed plaintiffs a check in the amount of $108.30, with a letter stating that this figure constituted the amounts collected by First American as premiums for credit life and disability insurance.

Mr. Pickett, an electrician by trade, had been employed by an electrical contractor since July, 1973, and following his March 5 back injury, he was unable to withstand the physical exertions required in this employment. He could not resume work until October 20, 1975. Six months later he reinjured his back, returned to work in November 1976, and in April 1977, was injured again. Since that time he has not been able to work and has undergone two operations as a result of the March 1975 injury. Expert testimony offered at trial indicated that, in the case of physically demanding work such as that in which he had been formerly engaged, Pickett's incapacity was of a permanent nature. The condition was diagnosed as an intervertebral disc syndrome with chronic sciatic neuritis and lumbar myositis.

The present complaint was filed on January 24, 1977. The complaint alleged that defendant committed the following act of negligence:

"That while said mortgage and promissory note were in full force and effect, defendant negligently and carelessly failed to secure said policy of credit life and disability although accepting plaintiff's monthly payments which included amounts attributable to said insurance."

The complaint was amended to further allege the following act of negligence:

"That while said mortgage and promissory note were in full force and effect, defendant failed to notify plaintiff that defendant had failed to secure said policy of credit life and disability insurance although accepting plaintiff's monthly payments which included amounts attributable to said insurance."

The complaint prayed for judgment as follows:

"(a) Ordering an accounting by defendant of the amount of benefits plaintiffs would have been entitled to had defendant secured a credit life and disability policy at the rate of $5.70 per month;

(b) Ordering defendant to pay to plaintiffs such sums as an accounting shall show to be due plaintiffs together with interest on all sums due plaintiff;

(c) Awarding attorney fees, costs of suit, and such other and further relief as the Court may deem just and proper."

As part of discovery, the plaintiffs filed a request to produce documents, requesting, *inter alia*, the "rate book of the carrier, or carriers, of credit accident and health insurance with respect to which defendant were [*sic*] taking application for said insurance, as of October 12, 1973."

At the beginning of the trial, plaintiffs withdrew subparagraph (c) of their prayer for judgment. In its written judgment, the court found that the plaintiffs "failed to prove the essential elements of their cause of action." The court reached this result by concluding that no policy of insurance was produced at trial which would enable the court to determine what amount of coverage was intended to be available to the Picketts, or how long such benefits were to remain in force, or under what, if any, conditions they were to continue, and fundamentally, what form or extent of physical disability would be required to activate the payment of insurance benefits. Implicit in the court's ruling was the conclusion that plaintiffs had prayed for the wrong relief in requesting an equitable accounting, where legal remedies were available. The court granted plaintiffs return of the $108.30 which they had paid defendant for insurance premiums, as a matter of "implied contract."

On appeal, we conclude that the evidence presented was sufficient to establish the existence of a contract to procure insurance between the parties, without reference to the terms of any specific credit life and disability insurance policy. In the interest of justice, we amend the complaint to conform the pleadings to the proof presented at trial on our own motion, and reverse the judgment of the trial court.

■■ Section 46(3) of the Civil Practice Act states that a "pleading may be amended at any time, before or after judgment, to conform the pleadings to the proof, upon terms as to costs and continuance as may be just." (Ill. Rev. Stat. 1979, ch. 110, par. 46(3); see also *In re Estate of Harris* (1976), 43 Ill. App. 3d 12, 15-16, 356 N.E.2d 1241, 1244.) This court is authorized

to amend the pleadings of a case on its own motion if necessary to conform the pleadings to the proof. (Ill. Rev. Stat. 1979, ch. 110A, pars. 362(f), 366(a)(1); *Pinelli v. Alpine Development Corp.* (1979), 70 Ill. App. 3d 980, 999-1001, 388 N.E.2d 943, 957; *McCartney v. McCartney* (1956), 8 Ill. 2d 494, 497, 134 N.E.2d 789, 791.) To the end that justice may be done, courts are liberal in the allowance of amendments conforming the pleadings to the proof, but the amendment's materiality to the evidence already introduced must be apparent, so that defendant is not prejudiced thereby. *In re Estate of Harris* (1976), 43 Ill. App. 3d 12; *Wolfenberger v. Madison* (1976), 43 Ill. App. 3d 813, 816-17, 357 N.E.2d 656, 657; *Powers v. Strum* (1973), 12 Ill. App. 3d 346, 350-51, 297 N.E.2d 628, 631.

For example, in *Simonson v. Simonson* (1970), 128 Ill. App. 2d 39, 48, 262 N.E.2d 326, 330, defendant in a divorce case contended that plaintiff's complaint lacked an essential element in failing to allege a lack of provocation towards acts of mental cruelty, and thus did not state a cause of action. The appellate court concluded that the evidence produced precluded any claim of provocation, and thus amended the complaint on its own motion. Similarly, in *Booker v. United Savings & Loan Association* (1964), 48 Ill. App. 2d 246, 198 N.E.2d 545, the complaint charged general negligence, but failed to allege that plaintiff's intestate was in exercise of due care for her own safety. The appellate court observed that plaintiff's evidence showed habits of due care of the deceased, and therefore allowed amendment of the pleadings on appeal to conform to the proof. In *Wolfenberger*, defendants claimed that plaintiff real estate broker never produced a buyer bound by an enforceable contract. The appellate court found evidence in the record regarding defendant's theory of the case, and therefore allowed amendment of the pleadings to include the defense of the Statute of Frauds, so that the pleadings would conform to the proof. 43 Ill. App. 3d 813, 817.

Where issues raised by the amendment are not supported by the facts in the record on appeal, the amendment will not be permitted, as it serves to prejudice defendant. Thus, where trial proceeded on a theory of "willful and wanton misconduct" and there was no fact in the record to support the notion that "negligence" was a theory of the case, amendment of the complaint to allege negligence has been denied on appeal. (*Griffin v. Darda* (1975), 28 Ill. App. 3d 693, 696-97, 329 N.E.2d 245, 248.) Similarly, where there was confusion as to the theory of the action in the trial court, it was assumed that defendant was prejudiced by an amendment of the pleadings. *County of Du Page v. Kussel* (1973), 12 Ill. App. 3d 272, 278, 298 N.E.2d 323, 327.

Several cases applying these general principles have particular relevance to the case on appeal. In *Powers*, this court permitted the plaintiff, after trial, to amend the *ad damnum* clause of his complaint to ask for

punitive as well as compensatory damages. The court found that there was evidence of defendant's willful and wanton conduct, and thus permitted amendment to conform the pleading to the proof. 12 Ill. App. 3d 346, 350-51, 297 N.E.2d 628, 631.

In *Pinelli* plaintiffs requested an accounting of profits and return of a parcel of real property transferred to defendants. Defendants claimed on appeal that the complaint failed to pray for rescission, the relief granted by the trial court:

"The first issue raised is whether the judgment in plaintiffs' favor may stand where the proof fails to support the allegations of their complaint and where neither their pleadings, proof, nor prayers for relief seek the remedy given. Defendants specifically argue that plaintiffs have not properly alleged and proven rescission and that the relief which the trial court gave plaintiffs was different than the relief which they had requested.

Initially, we note that we, as an appellate court, have the power to amend the pleadings on our motion if necessary to conform the pleadings to the proof. (Citations.) In light of the circumstances and facts of this case, an amendment upon our own motion would be appropriate if necessary." 70 Ill. App. 3d 980, 1000.

In *McCartney*, an elder brother brought suit against his younger brother to establish a constructive trust in realty which the elder brother had conveyed to the younger brother, and for an accounting for rents and profits. Plaintiff's two-count complaint was dismissed for want of equity, and a third count, as an amendment to the complaint, was found by the supreme court to fail to state any cause of action. Despite the infirmities of the pleadings, the supreme court found the evidence presented at trial sufficient to warrant relief. 8 Ill. 2d 494, 498-99, 134 N.E.2d 789, 791.

The thrust of these cases is that, when defendant is cognizant of the nature and circumstances of plaintiff's claim for damages and the theory behind that claim, and the claim is supported by evidence adduced at trial, the pleadings will be liberally construed. In the interest of justice, courts of review will not ignore the plaintiff's real claim so long as it is supported by the evidence, even though it may not have been adequately pleaded. *Mentesana v. LaFranco* (1979), 73 Ill. App. 3d 204, 208, 391 N.E.2d 416, 420.

In the instant case, the plaintiff's complaint alleged negligence and asked for an accounting. In such an action for negligence, the burden of proof is upon the plaintiff to demonstrate that the person so charged was under a duty to protect the plaintiff from the injury which resulted; that the defendant failed to conform his conduct to the standards of that duty; that defendant's conduct was the legal cause of the injury suffered; and that actual loss or damage resulted therefrom. (*Clinton v. Common-*

*wealth Edison Co.* (1976), 36 Ill. App. 3d 1064, 1071-72, 344 N.E.2d 509, 512; Restatement (Second) of Torts §328A (1965).) Where a party has failed to prove any one of these necessary elements, his cause of action must fail. See *Clinton*, 36 Ill. App. 3d 1064, 1072, 344 N.E.2d 509, 513.

The plaintiffs in the instant case presented persuasive evidence of a duty of care, of the breach of such duty, and of proximate cause leading to injury. But the trial judge, limiting his consideration to the plaintiff's prayer for an accounting, concluded that he was left without any means by which he might determine the dimensions of a compensable legal injury in the absence of a specific insurance policy.

In light of the preceding authorities, we believe the court's analysis was too limited. The evidence establishes an oral agreement to procure insurance on the part of defendant, and the negligent breach of the duty which it thereby assumed. The terms of a specific insurance policy are not required to establish damages, and we will not ignore the plaintiffs' real claim, supported by the evidence, on the sole ground that he requested an accounting in his complaint.

■■ The distinction between a contract of insurance, and the contract to procure insurance which we find here, is significant. In *Wheaton National Bank v. Dudek* (1978), 59 Ill. App. 3d 970, 376 N.E.2d 633, applicants for insurance sought damages arising out of an insurance agent's alleged negligence in failing to obtain insurance upon two snowmobiles and a trailer owned by applicants. The court outlined the difference in proof between a contract of insurance and a contract to procure insurance:

> "Defendant first argues that to recover the benefits of a contract for insurance, plaintiff must prove the terms and conditions of that contract. Although that may be true, what is at issue here is not a contract of insurance, but a contract to procure insurance and we believe the essential elements of a contract to procure insurance, were proved in the instant case. As indicated in *Gothberg v. Nemerovski* (1965), 58 Ill. App. 2d 372, 382, 208 N.E.2d 12, 18-19:
>
>> 'It is sufficient if one of the parties to such a contract proposes to be insured and the other party agrees to insure, and the subject, the period, the amount and the rate of insurance are ascertained or understood and the premium paid if demanded. [Citation.]' " *Wheaton*, 59 Ill. App. 3d 970, 972.

Such preliminary contracts to procure insurance may be proved by parol as well as by written evidence. (*Wheaton*, 59 Ill. App. 3d 970, 972; *Pimentil v. Milo Brooke, Inc.* (1956), 11 Ill. App. 2d 201, 203, 136 N.E.2d 608, 609.) Among other evidence, the elements of the contract to procure insurance may be implied from past dealings between the parties, from correspondence between the parties, or from conversations or customs prevalent in the locale. *Pimentil*, 11 Ill. App. 2d 201, 203, 136 N.E.2d 608, 609.

These principles have been applied in cases particularly significant to the case on appeal. In *Schmidt v. Sinclair* (1951), 342 Ill. App. 484, 97 N.E.2d 129, plaintiff sought a loan in the sum of $200 from defendant, doing business as "Brokers Finance Company," on November 30, 1948. As security for the loan, defendant demanded a chattel mortgage on plaintiff's automobile, with collision insurance on the car. A loan was executed for the total sum of $342.72, which represented the loan for $200, the collision insurance premium of $112.70, and the remainder of $30.02 for finance charges. Defendant issued two checks, one for $200 payable to plaintiff and the other for $112.70 payable to plaintiff and C.M. Griffith, Inc., an insurance broker. Plaintiff endorsed the check for the insurance premium and returned it to defendant, who retained it for the purpose of paying the broker. On December 12, 1948, plaintiff's automobile was involved in a collision, and the insurance policy was not issued until December 29, 1948. The court held that plaintiff could recover from defendant for the cost of repairs to her automobile:

"We think the evidence warranted a finding by the jury that defendant promised to procure the collision insurance and pay for it with the check which he retained in his possession; that the policy was to become effective from the time the loan was made and that plaintiff relied upon defendant's promise. By keeping possession of the insurance check defendant precluded plaintiff from obtaining insurance herself. In our view defendant's promise to obtain collision insurance was not an act of accommodation but an integral part of the transaction. Under these circumstances, defendant is liable for any loss sustained by plaintiff." *Schmidt*, 342 Ill. App. 484, 487-88, 97 N.E.2d 129, 131.

Even more apropos to the instant case is a Tennessee case, *Watkins v. Valley Fidelity Bank & Trust Co.* (Tenn. App. 1971), 474 S.W.2d 915. In *Watkins*, the administrator of an estate sued to recover damages due to a breach of contract to obtain credit life insurance on the life of plaintiff's decedent. The decedent obtained an automobile loan from a bank, and the total loan amount included $81.37 to be allocated to payment of a credit life insurance premium. Following decedent's death, the administrator discovered that the insurance had not been procured by the bank. The bank repossessed the car for failure to make payments, and the administrator brought suit. The trial judge found for the plaintiff, but fixed the amount of plaintiff's damages against the bank at $81.37, the amount of the loan retained by the bank for purchase of credit life insurance. The Court of Appeals found for the estate in the entire unpaid balance of the loan:

"When a bank makes a charge against a borrower for credit life insurance premiums, includes that amount in the loan, and retains the money so charged, we hold the bank not only assumes the

contractual obligation to properly apply the amount to credit life insurance, but also stands in a fiduciary capacity toward the borrower to see that the amount so charged and withheld is actually applied to the purchase of such insurance.

The inclusion of credit life insurance in a lender-borrower transaction is not for the sole benefit of, nor at the option of the lender. Credit life insurance is also a very important and vital part of the transaction to the borrower because it offers absolute protection to his estate for the unpaid balance of the debt in the event of his death before payment in full.

The bank failed to apply the $81.37 to the purchase of credit life insurance on the life of Morris Williams, and offered no reason therefor except error on the part of an employee. We hold the bank thereby breached its contract with Morris Williams, and breached its fiduciary duty to purchase the insurance, with a resulting loss to the estate of Morris Williams in the sum of $2,262.99, that being the unpaid balance of the debt." *Watkins*, 474 S.W.2d 915, 918.

The evidence presented in the instant case is very similar to that in *Watkins*, and it meets all the elements required to establish a contract to procure insurance. (See *Wheaton*, 59 Ill. App. 3d 970, 972.) The plaintiffs proposed to be insured by credit life and disability insurance, and defendant, through its representative, Executive Vice President Nolen, agreed to procure such insurance. The subject of the insurance was known by both parties to be Jimmy Pickett. The period of the insurance, probably the length of the loan, certainly extended through the 19 months during which the plaintiffs made premium payments, until Jimmy Pickett was injured. The amount of the insurance was understood by both parties to be payment in full of the mortgage payments which came due while plaintiff was disabled. The premium rate was $5.70 per month, which the plaintiffs paid for 19 months.

The only remaining question is the type of disability for which plaintiff was covered. Even this question need not be determined by the specific provisions of any policy. Again, when the issue is an agreement to procure insurance, the determinative factor is the understood agreement between the parties. Larry Nolen, the representative of defendant who closed the plaintiff's mortgage and agreed to procure the insurance, at trial offered his understanding of credit disability insurance:

"If I remember correctly, if the person's totally disabled and is proved to be so by a physician, the disability insurance would make the monthly payment until the person's able to go back to work."

Thus, even the disability element of the contract was understood by the

parties to the agreement, and was established by parol evidence. Any specific policy which did not provide for disability as the parties understood it, would have been materially defective insofar as the agreement between the parties was concerned. See *Johnson v. Illini Mutual Insurance Co.* (1958), 18 Ill. App. 2d 211, 151 N.E.2d 634, 637.

Furthermore, in a preliminary contract it will be presumed that the parties contemplate such form of policy containing such conditions and limitations as are usual in such cases. (*Devers v. Prudential Property & Casualty Insurance Co.* (1980), 86 Ill. App. 3d 542, 408 N.E.2d 462, 464.) Thus the plaintiffs did not fail to establish a measure of damages merely because specific insurance policies, under the control of defendant, were not presented into evidence.

Testimony at trial was unrebutted that defendant's back injury precluded him from working as an electrician, for which he was trained. Plaintiff was disabled from March 5, 1975, until October 20, 1975. He reinjured his back and was disabled from late April 1976 until November 1976. He was injured yet another time in April 1977, at which time he underwent surgery and remained disabled. The testimony of his treating physician was not rebutted. We therefore conclude that the evidence establishes defendant's liability based on negligence in failing to procure credit life and disability insurance on behalf of plaintiffs.

■■ In accord with the preceding conclusions, the court makes the following orders:

(1) The plaintiff's complaint, grounded on a theory of negligence, shall be amended to conform to the proof with the addition of the following *ad damum* clause:

"Wherefore, plaintiff prays for judgment finding that defendant breached a fiduciary duty toward plaintiff and was negligent, and awarding as damages the amount of monthly payments that should have been made during the periods that plaintiff was disabled."

(2) Plaintiffs are granted judgment for damages in the amount of monthly payments while Jimmy Pickett was disabled, including $2,025 for the periods from March through October 1975, and May through November 1976, and defendant is ordered to credit plaintiffs for monthly payments of $135, from May 1977 until the mortgage is paid, or until such time as Jimmy Pickett is no longer disabled and is physically able to maintain any employment for which he is trained and qualified.

Reversed.

KASSERMAN, J., concurs.

Mr. JUSTICE HARRISON, dissenting:

I respectfully dissent from the opinion of the majority.

While I agree that the facts presented by this record leave little question as to the equity and justice of the result which the majority reaches, it is equally clear to me that the limitations imposed upon us by that very same record dictate another outcome. My colleagues have seen fit to amend the pleadings concerned in order that they conform to evidence admitted at trial. This procedure is expeditious, equitable, and proper where the record in question contains evidence supportive of such amendment. but as an intermediate appellate court, we are restricted to matter which has come within the cognizance of the trial court. Only that which is transmitted to us in the record for review may serve as a basis upon which we may amend the pleadings. After a thorough examination of this record it is my firm conclusion that the necessary evidence is simply not extant.

I must certainly agree with the majority that in an action for negligence the burden of proof is upon the plaintiff to demonstrate that the person so charged was under a duty to protect the plaintiff from the injury which resulted; that the defendant failed to conform his conduct to the standards of that duty; that defendant's conduct was the legal cause of the injury suffered; and finally, that actual loss or damage resulted which embodies the fact of the injury. (*Clinton v. Commonwealth Edison Co.* (1976), 36 Ill. App. 3d 1064, 1067, 344 N.E.2d 509; Restatement (Second) of Torts §328A (1965); Prosser, §30 (4th ed. 1971).) But as the court in *Clinton* held, where a party has failed to prove any one of these necessary elements, his cause of action must fail. See *Clinton Commonwealth Edison Co.* (1976), 36 Ill. App. 3d 1064, 1067-68.

In the instant case the plaintiffs presented persuasive evidence of a duty of care, of the breach of such duty, and of proximate cause leading to injury. But, as the learned trial judge emphatically communicated to counsel for the plaintiffs in a colloquy during the latter's closing argument, the trial court was left without any means by which it might determine the dimensions of a compensible legal injury and, in certain respects, the very existence of such an injury was left in question.

No policy of insurance was produced at trial which would enable the court to determine what amount of coverage was intended to be available to the Picketts, or how long such benefits were to remain in force, or under what, if any, conditions they were to continue, and fundamentally, what form or extent of physical disability would be required to activate the payment of insurance benefits. It was not enough to show that Mr. Pickett, regrettably, suffered a severe back injury which prevented him from following the course of his trade during the

times alleged. That was not the injury which the trial court was urged to recognize. Plaintiffs' complaint charges negligent failure to procure insurance. According to its terms, such a policy of insurance would define the rights and responsibilities of the parties. The breach of duty is here, the failure to procure such a policy which resulted in costs to the plaintiffs, in the form of loan payments, which otherwise would have been provided through insurance benefits. The fact that plaintiffs were uninsured and were forced to find other means to meet this obligation is the legal injury for which a claim was presented. The nature and amount of the contemplated coverage which they were allegedly denied would be the measure of actual loss suffered. In addition, proof of the degree of disability required under the terms of a given policy would be a necessary precondition to any recovery whatsoever. Of these elements of their cause, there was a total failure of proof. Ironically, I must assume, by logical extension, that the seeds of such proof lay immediately before the plaintiff, inchoate, and yet implicit in evidence which was submitted to the trial court. I refer to the premium of $5.70 paid each month for the insurance in question. If a specific premium amount was quoted to the plaintiffs and thereafter faithfully remitted by them, is it not implicit that it was in reference to a particular policy of insurance, with a specific amount of coverage, of a specific duration, to be payable under prescribed conditions? Plaintiffs' testimony indicated that the defendant's loan officer quoted the premium figure from a rate book at his desk. Counsel for the plaintiffs, in his motion entitled "Request to Produce Documents", filed on March 30, 1979, sought, under paragraph No. 4, "the rate book of the carrier, or carriers, of credit accident and health insurance with respect to which defendant was taking applications for said insurance, as of October 12, 1973." The record nowhere indicates that the Picketts submitted such evidence to the court, if indeed the rate book was ever produced by the defendant. That evidence would certainly have indicated a particular insurer or insurers, whose policies might have been examined in order to provide the framework by which the court could determine the nature and extent of the injury. As well, in testimony, the names of at least two insurers were mentioned as being involved in the writing of this form of protection. No evidence was offered as to the provisions of policies issued by either company. Nor did the plaintiffs call to the witness stand any insurance expert qualified to enlighten the court as to what pattern of coverage had been generally available in the credit insurance industry to would-be insureds such as the Picketts in 1973.

To enable a party to garner a remedy rightfully his, it is a prerequisite that he address the court with a claim, the elements of which are supported by the necessary proof of underlying facts. The appellants

herein have failed to do so. Accordingly, I would affirm the decision of the circuit court.